IN THE UNITED STATE DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| DENNIS HARRIS | ) | |
| an Illinois individual, | ) | Civil Action No. |
| | ) | 15 CV 5040 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Judge Aspen |
| JOEL SHAW, MICHAEL MAGANA, | ) | |
| KEVIN SENOR, KAREN RABIDEAU, | ) | |
| JOEL DUMAS AND EDWARD JACOBS | ) | |
| | ) | |
| Defendants. | ) | |

## SECOND AMENDED COMPLAINT

Now comes Plaintiff, Dennis Harris ("HARRIS") by his counsel, David C. Brezina, of Ladas & Parry, LLP, 224 S Michigan Ave., Chicago, IL 60604, appointed pursuant to Local Rules 83.11(g) and 83.37 and submits herewith his Complaint as follows:

## FACTS

1. Plaintiff Dennis Harris is Inmate N-66154 currently in the custody of the Illinois Department of Corrections at Lawrence Correctional Center, 10940 Lawrence Road, Sumner, IL 62466.

2. Prior to being located at Lawrence Correctional Center, and at the time of the events which form a basis for this Complaint, he was in the custody of the Illinois Department of Corrections at Stateville Correctional Center, 16830 So. Broadway St. Joliet, IL 60434 (hereafter sometimes "Stateville").

3. At the times pertinent to this Complaint, on information and belief the following Defendants were employed at or otherwise in a position to exert authority over operations at Stateville:

    a. Corrections Officer Joel Shaw was an Internal Affairs/Gang Intelligence Office at Stateville;

    b. Michael Magana was, on information and belief, Acting Warden at Stateville beginning January 1, 2014, and served as warden January 17, 2014 to March 31, 2014;

    c. Kevin Senor, was Warden's Designee at Stateville, CC (I.D.O.C.) and on information and belief, reviewed the Warden's mail and Grievances and responded thereto on behalf of the Warden;

    d. Lt. Joel Dumas was an officer in charge of the 7-3 Shift at Edward House (sometimes "E-House") at Stateville;

    e. Lt. Edward Jacobs was an officer in charge of the 3-11 Shift at Edward House at Stateville;

    f. Ms. Karen Rabideau was Placement Officer at Stateville and, on information and belief, was in charge of moving inmates to different locations within Stateville;

4. On January 7, 2014, Harris occupied cell 704 at 7 Gallery, Edward House at Stateville.

5. On information and belief, on January 7, 2014 Harris was released from his cell and went to the shower with two other inmates, the inmates who went to the

shower being those who occupied the last (3) cells, Harris in cell 704, Rob in 703 and Damian Reed in 702.

    6.    On information and belief, on January 7, 2014 a prisoner was attacked by one or more assailants in the Edward House shower.

    7.    On January 9, 2014 Harris was taken from his cell to "the cage" the officer contemporaneously announcing in a voice audible to the gallery that Harris was to be taken to C.O. Shaw of "IA" and Harris was taken from "the cage" by officer Parker to the office area used by defendant C.O. Joel Shaw;

    a.    on said date Harris was present in said office area when another inmate, hereafter Inmate G, passed into said office area to be interviewed, Inmate G observing Harris in said office area;

    b.    on said date Harris was interviewed by defendant Shaw about said attack of the prisoner on January 7, 2014;

    c.    while Harris was being interviewed defendant Shaw took insufficient steps to protect either Harris's identity or the sensitive nature of the interview, in particular,

        i.    at the time of the interview the foyer door was open while Harris resulting in Harris being seen by several inmates while in the office area, including Inmate G;

        ii.    during the interview defendant Shaw spoke sufficiently loudly, as he questioned Harris, as to be overheard;

        iii.    Harris was the only person called off 7 Gallery on the 9th of January 2014 to be questioned regarding the attack on January 7, 2014.

8. On or about January 9, 2014, Harris communicated with Shaw describing, inter alia, that the occurrences surrounding the interview were such that Harris feared that other inmates would be able to identify him as having spoken to Shaw, that those other inmates would conclude that Harris was a "snitch" and that because of that conclusion, Harris feared that he would be attacked by one or more of the other inmates and would suffer injury or death. Because of the threat, Harris asked Shaw to have him moved out of E-House or at least off E-House 7 gallery.

9. In his January 9, 2014 communication to Shaw, Harris identified the threatening inmates as "young" and "guys up here." Harris additionally pointed out in the January 9, 2014 letter that his neighbor Riley had been placed in protective custody the preceding day because of danger arising from the similar occurrences.

10. Harris communicated with the Warden on or about January 9, 2014 describing that he had been placed in a situation by c/o Shaw of IA that made Harris appear to be a straight up snitch and asked to be relocated immediately to another cell house or down on 3 Gallery.

11. Harris additionally completed a grievance form on or about January 9, 2014 after describing the conduct of the interview described above attributing to Shaw the statement "tell me what is going on and what happened or I'm going to put you back out there" additionally identifying particular gang members and expressing Harris's concerns that the conduct of the interview would result in his being considered a snitch.

12. Harris communicated with the Placement Officer Rabadeau (sic) on or about January 9, 2014 requesting relocation off from 7 Gallery to Another Gallery or different Cell House because he felt like he was being placed in a seriously dangerous

situation by still being upon 7 gallery after being called by IA and questioned by c/o Shaw concluding that Harris really needed to be relocated away from this situation. Harris communicated that he felt his life may be in danger of something happening because they thought Harris was an "informant."

13. The information contained in the communications in paragraphs 8 – 12 comprised an emergency grievance.

14. On or about January 11, 2014 Harris again communicated with Shaw, repeating his concerns and identified the threatening inmates as "these young super silly guys up here." Harris deposited the letter with evening mail pickup.

15. On or about January 11, 2014 Harris again communicated with the Placement Officer Rabadeau (sic) requesting relocation off from 7 Gallery to Another Gallery or different Cell House because he felt like he was being placed in a seriously dangerous situation by still being upon 7 gallery after being called by IA and questioned by c/o Shaw concluding that Harris really needed to be relocated away from this situation. Harris communicated that he felt his life may be in danger of something happening because someone thought Harris was an "informant" when he was not.

16. Harris deposited communications described in paragraphs 8 – 12, 14 - 15 with evening mail pickup on or about the days identified.

17. During the time period described above, the IDOC was evaluating whether or not to transfer Harris to a different facility. Transfer of Harris to a different facility was denied by the Illinois Department of Corrections said denial being communicated to Harris on January 22, 2014 (IDOC 060, IDOC Memorandum Transfer Denial) but on information and belief IDOC failed to consider the danger to Harris in its decision

whether or not to transfer or to reconsider its decision at the time the memorandum was prepared to Harris.

18. On or about January 21, 2014 Harris communicated with defendant Shaw, asked to be moved off of E-House 7 Gallery because his life was in danger and asking to be moved to Pontiac PC immediately because the young stupid guys were labelling Harris a snitch because of Shaw's sending for Harris to be questioned as described in the preceding paragraphs.

19. On or about January 28, 2014 Harris again communicated with defendant Shaw, asking to be transferred to another facility and/or requested placement in protective custody, identifying the threatening inmates as "young" and "guys."

20. On or about February 1, 2014 Harris prepared three Grievance forms one submitted to the Edward House counselor, one addressed to Springfield and one to the Chief Administrator that communicated, inter alia,

    a. Shaw's interview procedures described in paragraph 7 caused exposure of Harris to being considered a "snitch" by other inmates;

    b. Harris was concerned over suffering injury as a result of a retaliatory attack;

    c. "younger" inmates were those providing the threat to Harris;

Harris placed the February 1, 2014 Grievances in the evening mail.

One of the grievances was addressed to the counselor, one to the Department of Corrections supervisory grievance office in Springfield and one to the grievance officer at Stateville.

21. On or about February 1, 2014, Harris communicated to defendants Lt. Jacobs and Lt. Dumas that the occurrences surrounding the interview were such that Harris feared that other inmates would be able to identify him as having spoken to Shaw, that those other inmates would conclude that Harris was a "snitch" and that because of that conclusion, Harris feared that he would be attacked by one or more of the other inmates and would suffer injury or death. In said communications, Harris identified the other inmates who he feared as "the crowd up here", "young", "a younger crowd" and "youngsters." The foregoing identification had sufficient particularity that defendants could readily evaluate the severity of and source of the threat to Harris' safety, health and well-being, the nature of the threat, the based on their familiarity with inmates in Edward House, likely means to execute the threat. This also was placed in the evening mail.

22. On or about February 4, 2014 Harris communicated with defendant Shaw, identifying the need to be relocated because his life was being threatened and asked to be moved off of E-House 7 Gallery because his life was in danger and asking to be moved by placement to another facility or Pontiac PC immediately because the goofy young guys labelled Harris a snitch because of Shaw's sending for Harris to be questioned as described in the preceding paragraphs. Harris communicated that he feared for his safety. Harris deposited the communication with evening mail pickup.

23. Harris communicated with the Administrative Review Board on or about February 10, 2014 forwarding a copy of the grievance described in paragraph 19, questioning whether the February 1, 2014 had been received, after being mailed as Harris was instructed.

24. Harris communicated with the Warden's Chief Administrative Officer again on or about February 10, 2014 referencing his letter to Warden Lemki (sic) referenced in paragraph 10 and repeating Harris' safety being placed in danger, the questioning of Harris by other inmates regarding whether Harris ratted out an inmate in the shower, describing Shaw as having placed Harris in a deadly situation, and again requesting to be relocated or placed in protective custody.

25. Harris communicated with the Chief Administrative Officer Warden February 13, 2014 "in light of new development" asking be relocated or placed in protective custody "because my name is now being circulated as being an informant" observing "this guys are calling me a snitch I need to be moved I fear for my safety."

26. Between January 9, 2014 and February 16, 2014 Harris spoke with Lieutenant Joel Dumas and Lieutenant Edward Jacobs his fears for his safety after being labeled a snitch, specifically but not limited to Harris spoke with Lt. Dumas on January 25, 2014 and February 14, 2016 and Lt. Jacobs on around February 15, 2014. After Harris related his fears to each, Harris was directed to write and seek out assistance from the Placement Officer, c/o Shaw and the Stateville CC Warden. Additionally, when Harris communicated the threats, he was told, regarding the specific inmates and specific threats, that "These guys are just woofing (make idle threats)".

27. Contemporaneous with the communications in the preceding paragraph, Harris requested transfer to a different, and safer, correctional center or to be placed in protective custody.

28. On information and belief, between January 9, 2014 and February 16, 2014 inmate Inmate G was moved back to Edward House, the same building in which Harris was located.

29. On February 16, 2014 Harris was attacked by another inmate (who on information and believe, known as "KT") a result of which was that Harris's jaw was broken in several places severely on the right side of his face (head). The attacker called Harris "Punkass Snitch" right before Harris was struck and knocked unconscious.

30. Since that attack Harris has suffered emotional distress, blurred vision, and headaches. Harris' sometimes slurs and Harris can no longer open my mouth to the same extent he could prior to said attack. Prior to that attack Harris had been an excellent singer which ability has been impaired by his broken jaw.

## COUNT I

### FAILURE TO PROTECT HARRIS IN VIOLATION OF THE EIGHTH AMENDMENT

31. Based on the repeated communications regarding threats from "young", "younger" and "youngster" inmates "up here" reference to "this guys [sic]" and given the specific familiarity of defendants with other inmates located proximate 7 gallery, Edward House, Defendants knew of the severity of and source of the threat to Harris' safety, health and well-being, the nature of the threat, and based on their familiarity with inmates in Edward House, likely means to execute the threat to Harris, which threat did in fact become manifest on February 16, 2014, despite the repeated requests for relocation of protective custody for more than one month.

32. Defendants maintained or permitted one or more policies, practices and/or customs that caused Plaintiff s injuries, including;

a. failure to interview Harris in a location and under circumstances that would prevent other inmates from observing Harris being interviewed;

b. failure to adequately train, supervise and/or control correctional officers, investigative and administrative persons with respect to proper interview, communication, grievance and safety procedures;

c. failure to consider danger to Harris in denial of transfer when that danger had been communicated before denial of transfer was reported to Harris;

d. failure to promptly and effectively communicate letters from Harris to persons in positions to provide protection of his safety;

e. failure to promptly and effectively assess the danger to Harris and take steps necessary and advisable to protect Harris;

f. failure to protect Harris from attack.

33. As acting Warden and Warden Defendant Magana was responsible for overseeing the day to day operation of Stateville and for creating and implementing the policies, practices and/or customs of Stateville, including the grievance process. Defendant Senor as Warden's Designee was responsible for the proper and effective operation of the grievance process and appropriate resolution of grievances. Defendants Dumas and Jacobs were responsible for the training, supervision and discipline their subordinates. Defendant Rabideau was responsible for placement of Harris in an appropriately safe gallery or cell block. Defendant Shaw was responsible for properly conducting investigations and treatment and movement of Harris in such a manner that would not cause risk of harm.

34. Defendants knew or should have known that maintaining or permitting one or more of such policies, practices and/or customs or that failure to act when Harris requested protection would result in or tacitly authorize the violation of Harris's Constitutional rights alleged herein, and Defendants were deliberately indifferent to the likelihood that any such violation would occur.

35. These policies, practices and/or customs and the failure to act when Harris requested protection were the cause of Harris's injuries because, but for these policies, and failures to act, Harris would have received adequate protection and therefore avoided injuries inflicted on him and avoided the violation of his Constitutional rights.

36. Harris promptly and repeatedly communicated to Defendants the circumstances that lead to his being in danger the reason he feared for his safety sufficient identification of the persons who threatened him, with sufficient particularity that Defendants, with their extensive experience and knowledge could assess the threat, and accordingly Defendants were aware of this dangerous environment.

37. As described above, Harris was incarcerated under conditions posing a substantial risk of serious harm, namely retaliation based on a perception that he was a snitch, which perception was directly caused by Defendant Shaw, and which risk was communicated to all Defendants thereby comprising both subjective and objective knowledge of the risk of harm.

38. Defendants are liable for Harris's injuries because they were deliberately indifferent to the substantial risk that Harris would be attacked.

39. Harris was attacked as alleged in Paragraph 29 of this Complaint.

40. As a direct and legal result of defendants' acts and omissions, Harris has suffered damages, including without limitation, injury to his jaw and mouth, persistent speech and eating problems, and pain and suffering.

41. The acts and omissions of Defendants were willful, malicious, intentional, oppressive, reckless and/or were done in conscious disregard of Harris's rights, welfare and safety, thereby justifying an award of punitive and exemplary damages in an amount to be determined at trial.

42. Plaintiff's injuries were the direct result of actions and inactions by Defendants because each Defendant was in a supervisory or direct position such that they could have and should have had Harris moved or otherwise protected so that he would not suffer attack and therefore as supervisors, Defendants (in their official capacity) are liable for Harris's injuries.

## RELIEF

WHEREFORE, Plaintiff requests entry of judgment in his favor and against Defendants as follows:

43. For compensatory, general and special damages in an amount according to proof ;

44. For punitive damages against individual Defendants;

45. For reasonable costs of this suit, including expert fees and attorney 's fees, pursuant to 42 U.S.C. § 1988; and

46. For such further relief as the Court may deem just, proper and appropriate.

## JURY TRIAL DEMAND

47. Plaintiff demands a jury trial as to all claims for damages pursuant to the Seventh Amendment to the Constitution of the United States.

Respectfully submitted,

*David C. Brezina*

David C. Brezina
Attorney for Plaintiff, pursuant
to LR 83.11(g) and 83.37
Ladas & Parry LLP
224 S. Michigan Avenue,
Suite 1600
Chicago, IL 60604
(312) 427-1300
dbrezina@ladas.net

CERTIFICATE OF SERVICE

I hereby certify that on May 12, 2016, I electronically filed the foregoing with the Clerk of the Court for the United States District Court for the Northern District of Illinois. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system

Jeanne N. Brown (Email: jebrown@atg.state.il.us)
Jeffrey John Freeman (JFreeman@atg.state.il.us)
Jennifer Marie Lutzke (Email: jlutzke@atg.state.il.us)
Lyle Kevin Henretty (lhenretty@atg.state.il.us)
Illinois Attorney General's Office
100 W. Randolph
13th Floor
Chicago, IL 60601

Respectfully submitted:

May 12, 2016                By:   /David C. Brezina/
                            David C. Brezina
                            Ladas & Parry, LLP
                            224 South Michigan Avenue, #1600
                            Chicago, IL  60604
                            Tel 312.427.1300
                            Fax 312.427.6663